1

2

3                                                          O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   JAMES F. DODARO, as an    )   Case No. EDCV 09-01666-VAP
     individual and on behalf  )   (OPx)
12   of all other similarly    )
     situated,                 )   **[Motion filed on January 22,**
13                             )   **2010]**
                   Plaintiff,  )
14                             )   **ORDER GRANTING DEFENDANTS'**
         v.                    )   **MOTION TO DISMISS FOR LACK**
15                             )   **OF STANDING, WITH PREJUDICE,**
     STANDARD PACIFIC CORP.;   )   **AND DENYING DEFENDANTS'**
16   STANDARD PACIFIC HOMES,   )   **MOTION TO STRIKE AS MOOT**
     INC.; STANDARD PACIFIC    )
17   MORTGAGE, INC.; and DOES  )
     1 through 10, inclusive,  )
18                             )
                   Defendants. )
19   _____  )

20

21        Defendants' Motions to Dismiss and to Strike came

22   before the Court for hearing on March 15, 2010.  After

23   reviewing and considering all papers filed in support of,

24   and in opposition to, the Motions, as well as the

25   arguments advanced by counsel at the hearing, the Court

26   GRANTS the Motion to Dismiss and DENIES the Motion to

27   Strike as moot.

28

# I.   BACKGROUND

## A.   Plaintiff's Allegations

Plaintiff James F. Dodaro ("Plaintiff") alleges he purchased a new residence in November 2005 in Riverside County, California from Standard Pacific Homes, made a down payment of about 60% of the total purchase price, financed the balance of the purchase through Family Lending Services. Inc. (now Standard Pacific Mortgage), and still lives in the residence.  (First Amended Complaint ("FAC") ¶ 35.)

Plaintiff brings this putative class action on behalf of himself and a national class including "[a]ll Standard Pacific Homes customers who purchased a new Standard Pacific Homes house from January 1, 2004, through December 31, 2006, and put 20% or more down toward the purchase of the house[,]" or alternatively, "a class of new Standard Pacific Homes customers whose homes are located in California."  (FAC ¶¶ 48-49.)

Plaintiff alleges "on information and belief" that before 2004, Defendants Standard Pacific Corp., doing business as Standard Pacific Homes, and Standard Pacific Mortgage, Inc. (collectively, "Defendants" or "Standard Pacific Defendants") implemented a "scheme" to increase the number of houses sold in Plaintiff's neighborhood and the amount of profit per sale.  (FAC ¶ 18.)  The "scheme"

1   was intended to "convince government entities, then the
2   community, and finally buyers that Defendants were
3   building a traditional neighborhood with stable owners
4   who occupied their homes and who were vested in the
5   community and the neighborhood."   (FAC ¶ 19.)   "Implicit
6   in this marketing scheme was that Defendants were making
7   a good-faith effort to sell homes to buyers who
8   [Defendants] expected could afford to buy the houses and
9   would be stable neighbors."   (Id.)

10

11       Plaintiff alleges that he was provided "marketing
12   materials that depicted the community as a stable,
13   family[-]based neighborhood."   (FAC ¶¶ 35, 36.)
14   Plaintiff also alleges "on information and belief" that
15   Defendants represented that Standard Pacific does not
16   sell homes to investors and discourages speculation.
17   (FAC ¶ 38.)

18

19       Plaintiff alleges Defendants engaged in a scheme to
20   market the houses to, and provide financing for,
21   "unqualified buyers who posed an abnormally high risk of
22   foreclosure . . . to increase both the number of sales
23   and the prices of the houses in same neighborhoods in
24   which Defendants were selling to traditionally qualified
25   and low-foreclosure- risk buyers."   (FAC ¶ 20.)
26   Plaintiff generally alleges that Defendants assisted and

27

28

encouraged the "unqualified" buyers to appear qualified. (FAC ¶ 23.)

Plaintiff asserts that Defendants "concealed and intentionally failed to disclose to prospective buyers . . . that numerous houses in the neighborhoods were being purchased by unqualified and high-foreclosure-risk buyers, despite Defendants' knowledge that this could, and likely would over time, have a material negative effect on the value and desirability of the house and the neighborhood." (FAC ¶ 29.) Plaintiff alleges Defendants also failed to disclose that "they had sold houses, and planned to sell houses in the future, to investors who would not occupy the houses." (FAC ¶ 44.)

Plaintiff alleges two theories of harm stemming from Defendants' conduct. First, Plaintiff alleges he "paid inflated prices for [his] house[]" as a result of Defendants' failure to disclose that "Defendants had sold houses . . . to unqualified and high-foreclosure-risk buyers. . . [and] to investors who would not occupy the houses." (FAC ¶¶ 45, 48.) Secondly, Plaintiff alleges he suffered an injury years after purchasing his house when the real estate market declined and the "unqualified" buyers defaulted on their loans and lost their houses in foreclosure proceedings, which led to a

4

decline in the value of Plaintiff's residence.   (FAC ¶ 47.)

**B.   Procedural History**

     On September 3, 2009, Plaintiff filed a putative class action against the Standard Pacific Defendants.   On the same day, Plaintiff's counsel filed seven other similar class actions[1] ("Homebuilder Actions") alleging that the homebuilder defendants and their mortgage lending affiliates engaged in conduct that "artificially inflated" the purchases prices of plaintiffs' residences and eventually reduced their value.

     On October 23, 2009, the Standard Pacific Defendants filed a "Motion to Consolidate," which sought to consolidate the eight Homebuilder Actions.   The Court

---

[1] The Homebuilder Actions are:
- <u>Dodaro v. Standard Pacific Corp., et al.</u>, ED09-CV1666-VAP (OPx)
- <u>Stephens, et al. v. Lennar Corp., et al.</u>, ED09-CV1668-SGL (DTBx)
- <u>Lumalu et al. v. Richmond American Homes Corp., et al.</u>, ED09-CV1669-SGL (OPx)
- <u>Oneto v. The Ryland Group, Inc., et al.</u>, ED09-CV1670-SGL (DBTx)
- <u>Maya, et al. v. Centex Corp., et al.</u>, ED09-CV1671-SGL (OPx)
- <u>Martinez, et al. v. D.R. Horton, et al.</u>, ED09-CV1672-VAP (DBTx)
- <u>Nielson, et al. v. Shea Homes, Inc, et al.</u>, ED09-CV1673-SGL (DTBx)
- <u>Kelly, et al. v. Beazer Homes USA, Inc., et al.</u>, ED09-CV1674-SGL (DTBx)

denied the Motion to Consolidate.  On November 18, 2009, the Homebuilder Actions were transferred to this Court. On December 21, 2009, Plaintiff filed the FAC, which removed Defendant Standard Pacific Homes, Inc. and added allegations regarding the two remaining defendants, Standard Pacific Corp, doing business as Standard Pacific Homes, and Standard Pacific Mortgage, Inc.  The substance of the claims remains unchanged.

Plaintiff alleges five claims: (1) fraud; (2) negligent misrepresentation; (3) violation of California's Unfair Business Practices Act, Cal. Bus. & Prof. Code §§ 17200, <u>et seq.</u>; (4) violation of Cal. Bus. & Prof. Code §§ 17500, <u>et seq.</u>; and (5) breach of the implied covenant of good faith and fair dealing.

On January 22, 2010, Defendants filed: (1) a Motion to Dismiss the First Amended Complaint ("Motion"), and (2) a Motion to Strike Portions of the First Amended Complaint.  It their Motion to Dismiss, Defendants incorporate by reference the arguments advanced by defense counsel in <u>Stephens, et al. v. Lennar Corp, et al.</u>, ED09-CV1668-VAP (DTBx) and <u>Nielson, et al. v. Shea Homes, Inc, et al.</u>, ED09-CV1673-VAP (DTBx).  (Mot. at 3-4.)  On February 22, 2010, Plaintiff filed Opposition[2] to

---

[2] Counsel for the plaintiffs the eight Homebuilder Actions divides the subject matter of their Oppositions
(continued...)

both Motions.  On March 4, 2010, Defendants filed a Reply for both Motions.

Defendants argue the FAC should be dismissed for the following reasons: (1) Plaintiff lacks constitutional standing to bring this action; and (2) Plaintiff fails to state a claim as to each cause of action under 12(b)(6).  (Mot. at 1.)

## II.  LEGAL STANDARD FOR MOTION TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted.  As a general matter, the Federal Rules require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); <u>Bell Atlantic</u>

---

[2](...continued)
to Homebuilder Defendants' Motions as follows:
- <u>Stephens, et al. v. Lennar Corp, et al.</u>, ED09-CV1668-VAP (DTBx): Plaintiffs' Opposition addresses constitutional standing ("Stephens Opp'n").
- <u>Oneto v. The Ryland Group, Inc., et al.</u>, ED09-CV1670-VAP (DBTx): Plaintiffs' Opposition addresses Plaintiffs' UCL claims and claims for breach of the implied covenant of good faith and fair dealing ("Oneto Opp'n").
- <u>Nielson, et al. v. Shea Homes, Inc, et al.</u>, ED09-CV1673-VAP (DTBx): Plaintiffs' Opposition addresses Rule 9 ("Nielson Opp'n.").

Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In addition, the Court must accept all material allegations in the complaint -- as well as any reasonable inferences to be drawn from them -- as true.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

In other words, the allegations must be plausible on the face of the complaint.  See Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to

8

1  relief.'"   Id.   (citations and internal quotations

2  omitted).

3

4       Although the scope of review is limited to the

5  contents of the complaint, the Court may also consider

6  exhibits submitted with the complaint, Hal Roach Studios,

7  Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19

8  (9th Cir. 1990), and "take judicial notice of matters of

9  public record outside the pleadings," Mir v. Little Co.

10 of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988).

11

12      "Failure to properly allege standing is a ground for

13 dismissal under Rule 12(b)(6)." MAI Sys. Corp. v. UIPS,

14 856 F. Supp. 538, 539 (N.D. Cal. 1994), citing W. Mining

15 Council v. Watt, 643 F.2d 618 (9th Cir. 1980).

16

17                    **III.   DISCUSSION**

18      Article III of the Constitution gives federal courts

19 jurisdiction over "cases and controversies."  U.S. Const.

20 Art. III, § 2, cl. 2.  "In essence the question of

21 standing is whether the litigant is entitled to have the

22 court decide the merits of the dispute or of particular

23 issues." Warth v. Seldin, 422 U.S. 490, 498 (1975).

24 Standing, therefore, is a threshold issue in every

25 federal case.  Elk Grove Unified Sch. Dist. v. Newdow,

26 524 U.S. 1, 11 (2004) ("In every federal case, the party

27 bringing the suit must establish standing to prosecute

28

1  the action."); Warth, 422 U.S. at 517-18;  McMichael v.

2  County of Napa, 709 F.2d 1268, 1269 (9th Cir. 1983)

3  ("Before the judicial process may be invoked, a plaintiff

4  must 'show that the facts alleged present the court with

5  a 'case or controversy' in the constitutional sense and

6  that [he] is a proper plaintiff to raise the issues

7  sought to be litigated.'"), citing Linda R.S. v. Richard

8  D., 410 U.S. 614, 616 (1973).

9

10      To satisfy the "case or controversy" requirement, a

11  plaintiff "must demonstrate that he has suffered an

12  'injury in fact'" that a favorable judgment will redress.

13  Whitmore v. Arkansas, 495 U.S. 149, 155 (1990); Newdow,

14  542 U.S. at 12, citing Lujan v. Defenders of Wildlife,

15  504 U.S. 555, 560-561 (1992).  In other words, a

16  plaintiff must demonstrate: (1) he has suffered an

17  "'injury in fact' -- an invasion of a legally protected

18  interest which is (a) concrete and particularized, and

19  (b) actual or imminent, not conjectural or hypothetical";

20  (2) there is a causal connection between the injury and

21  the conduct complained of -- that is, the injury is

22  "fairly traceable" to the challenged action of the

23  defendant, and not the result of the independent action

24  of some third party not before the court; and (3) it is

25  "likely," as opposed to merely "speculative," that the

26  injury will be redressed by a favorable judicial

27

28

1  decision.  <u>Lujan</u>, 504 U.S. at 560-61 (footnote,

2  citations, and quotation marks omitted).

3

4      The party invoking federal jurisdiction bears the

5  burden of establishing the elements of standing.  <u>Lujan</u>,

6  504 U.S. at 561, citing <u>FW/PBS, Inc. v. Dallas</u>, 493 U.S.

7  215, 231 (1990); <u>Warth</u>, 422 U.S. at 508.  As the three

8  elements of standing "are not mere pleading requirements

9  but rather an indispensable part of the plaintiff's case,

10 each element must be supported in the same way as any

11 other matter on which the plaintiff bears the burden of

12 proof, <u>i.e.</u>, with the manner and degree of evidence

13 required at the successive stages in litigation."  <u>Lujan</u>,

14 504 U.S. at 561; <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S.

15 871, 883-89 (1990); <u>Gladstone Realtors v. Village of</u>

16 <u>Bellwood</u>, 441 U.S. 91, 114-15 & n.31 (1979); <u>Simon v. E.</u>

17 <u>Kentucky Welfare Rights Org.</u>, 426 U.S. 26, 45 & n.25

18 (1917); <u>Warth</u>, 422 U.S. at 527 & n.6).  "At the pleading

19 stage, general factual allegations of injury resulting

20 from the defendant's conduct may suffice . . . ."  <u>Id.</u>,

21 citing <u>Nat'l Wildlife Fed'n</u>, 497 U.S. at 889.

22

23     Plaintiff must satisfy Article III standing

24 requirements to assert each of his claims in federal

25 court.  As Plaintiff's claims all are founded upon the

26 same alleged injuries, the Court's analysis applies to

27 each of them.  Plaintiff fails to establish standing

28

1  because he has not pled an injury in fact and has not
2  shown how his alleged injuries are "fairly traceable" to
3  Defendants' alleged actions.

4

5  **A.   Injury in Fact**

6      Defendants first focus on whether Plaintiff has
7  suffered a "concrete and particularized, and actual or
8  imminent" injury necessary to meet the first element of
9  Article III standing.  Lujan, 504 U.S. at 560-61.  To
10 satisfy the "injury in fact" requirement, "[t]he
11 plaintiff must show that he has sustained or is
12 immediately in danger of sustaining some direct injury as
13 a result of the [defendant's] conduct and the injury or
14 threat of injury must be both real and immediate, not
15 conjectural or hypothetical."  City of Los Angeles v.
16 Lyons, 461 U.S. 95, 101-02 (1983) (citations omitted);
17 Lujan, 504 U.S. at 560 ("[By injury in fact we mean] an
18 invasion of a legally protected interest which is (a)
19 concrete and particularized, . . . and (b) actual or
20 imminent, not 'conjectural' or 'hypothetical'.").

21

22     As noted above, Plaintiff alleges he was injured by
23 (1) paying a "inflated" purchase price for his house as a
24 result of the "buying frenzy" created because Defendants
25 sold houses to "unqualified" buyers ("overpayment
26 theory") (FAC ¶¶ 31, 34), and (2) a reduction in the
27 value of his property caused by Defendants' wrongful acts
28

12

and omissions ("reduced-value theory") (FAC ¶¶ 31, 47). These alleged harms fall short of a concrete, particular, and actual injury.

### 1.   Reduced-Value Theory

The Court first considers Plaintiff's reduced-value theory.  Plaintiff still owns his house, so his assertions of loss are conjectural.  Any loss (or gain) -- presumably measured against the initial purchase price -- cannot be ascertained, nor measured, unless and until the owner sells the house.  See Phillips v. Frank, 295 F.2d 629, 632 (9th Cir. 1961) (recognizing that a gain or loss in real property cases is determined at the time of sale).

Moreover, the cause of any such loss cannot be determined until that time as well.  In other words, Plaintiff has alleged only harm which, rather than being specific and concrete, is general and tied so closely to pervasive economic conditions and harms, that it does not suffice as an allegation of direct injury.  See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 770 (2d Cir. 1994) (recognizing that a number of variables can affect real estate values).

Other courts have reached the same conclusion when faced with nearly identical allegations.  See Kaing v.

<u>Pulte Homes, Inc.</u>, No. 09-5057, 2010 WL 625365, at *5-6 (N.D. Cal. Feb. 18, 2010); <u>Tingley v. Beazer Homes Corp.</u>, No. 07-176, 2008 WL 1902108, at *5, n.3 (W.D.N.C. April 25, 2008) ("harm is only realized if Plaintiffs sell their home."); <u>Green v. Beazer Homes Corp.</u>, No. 07-1098, 2007 WL 2688612, at *3 (D.S.C. Sept. 10, 2007) (dismissing the action because "Plaintiff does not . . . suggest that she or any of her other similarly 'injured' neighbors have realized this decrease in value (<u>e.g.</u>, as a result of sale of the home).").

In <u>Kaing</u>, the district court found that a plaintiff in a putative class action against defendant homebuilders lacked standing to assert a theory "that she ha[d] been injured because [the homebuilders'] lending practices caused widespread foreclosures in her neighborhood, [which had] driven down the value of her house." 2010 WL 625365, at *5. There, the plaintiff alleged that the defendants "marketed the neighborhoods as stable and desirable neighborhoods, while becoming even more aggressive in selling homes to unqualified and high-foreclosure-risk buyers . . . ." <u>Id.</u> at *2. The plaintiff alleged that high foreclosure rates in her neighborhood decreased the value of her house by over 50%. <u>Id.</u>

Furthermore, the Kaing defendant homebuilders' misconduct also allegedly "result[ed] in abandoned houses; multiple families living in one home; transient neighbors with no long-term ties to the neighborhood; unfinished yards and unkempt yards; and, in some cases, increased crime." Id. at *5.  There, as here, the plaintiff still owned her residence when she brought the action.  Id. at *1-2.  Also like the Plaintiff here, the Kaing plaintiff alleged she was harmed by the homebuilder defendants' failure to provide her with a disclosure that "Defendants had sold houses, and would sell houses in the future, to unqualified and high-foreclosure-risk buyers." Id. at *2.

Distinguishing "general economic harms" from the harm in cases where a plaintiff's injury arose from a physical change to the neighborhood's environment, the Kaing court noted, "[A] decline in value that is tied to a purely economic change to a neighborhood is much more difficult to characterize as 'concrete and particularized, and actual or imminent.'  Such economic conditions are likely to change with the broader economy, and any decline in housing value can potentially evaporate before Plaintiff has suffered a concrete injury, even in the absence of redress from the courts." Id. at *5, citing Lujan, 504 U.S. at 560-61.  As the plaintiff had not sold, or even attempted to sell, her house under the changed economic

conditions, the court concluded, "[I]t is not clear that
the diminished value of her house is cognizable as an
'injury in fact.'"   Id.

In reaching its conclusion, the Kaing court relied on
two other cases arising under similar circumstances --
Tingley and Green.   In both cases, the plaintiffs filed
putative class actions against defendant homebuilders,
claiming the defendants targeted low-income purchasers,
which resulted in high rates of foreclosure in
plaintiffs' neighborhoods and consequently decreased the
value of the plaintiffs' residences.   See Tingley, 2008
WL 1902108, at *1-2; Green, 2007 WL 2688612, at *2.

Although the Tingley court premised its holding on
lack of causation rather than injury in fact, the court
noted, "Since the reduced value about which Plaintiffs
complain would have resulted from an economic glut of
supply, then such harm is only realized if Plaintiffs
sell their home during such glut.   If Plaintiffs chose to
remain in their home until more favorable economic
conditions arrive, then they will have realized no loss
at all."   Tingley, 2008 WL 1902108, at *5, n.3.

The Green court adopted similar reasoning, holding
that although the plaintiff alleged an injury in the form
of a generalized loss in the potential market value of

her house due to excessive foreclosures on other houses
in her neighborhood, she did not "suggest that she or any
of her other similarly 'injured' neighbors [had] realized
this decrease in value (e.g., as a result of sale of the
home)."  Green, 2007 WL 2688612, at *3.  The court thus
concluded that the plaintiff's injury was neither
concrete nor particularized.  Furthermore, it reasoned,
"the alleged cause of the decreased value (excessive
foreclosures) is of a type which would not necessarily
have a long term impact on home prices.  This strongly
suggests that the injury is conjectural and speculative,
and not actual or imminent."  Id., citing Lujan, 504 U.S.
at 560-61.

    Here, Plaintiff has not sold his house at a loss or
suffered any actual loss arising from the harms he
alleges in the FAC.  (See FAC ¶¶ 36, 37.)  Thus, like the
plaintiffs in Kaing, Tingley, and Green, Plaintiff has
not "realized [a] decrease in value."  Kaing, 2010 WL
625365, at *5; Tingley, 2008 WL 1902108, at *5 n.3;
Green, 2007 WL 2688612, at *3.  Furthermore, the injury
is speculative, rather than actual or imminent, because
economic conditions affecting the value of Plaintiff's
house is subject to change with broader economic
conditions.  Green, 2007 WL 2688612, at *3; Tingley, 2008
WL 1902108, at *4 ("it is just as plausible that a
positive change in the unemployment rate, the housing

market, the mortgage interest rates or other economic factors could cause <u>an</u> <u>increase</u> in [Plaintiff's] property value.") (emphasis added).   Thus, the alleged decline in value that Plaintiff claims to have suffered may vanish before Plaintiff suffers a concrete injury.   <u>See</u> <u>Kaing</u>, 2010 WL 625365, citing <u>Lujan</u>, 504 U.S. at 560-61.

To bolster his claim and distinguish the facts here from <u>Tingley</u> and <u>Green</u>, Plaintiff alleges he suffered additional injuries: "[U]nstable neighborhoods, multiple families living in one home, transient neighbors with no long-term ties to the neighborhood, unfinished and unkempt yards, and in some cases, increased crime."   (<u>See</u> Stephens Opp'n at 13.)   This attempt fails, however, because Plaintiff's FAC contains nothing more than speculation to link these harms to Defendants' conduct or omissions.   <u>See</u> <u>Kaing</u>, 2010 WL 625365, at *5-6 (holding that plaintiffs claiming similar injuries failed to allege a cognizable injury in fact).   <u>See</u> Section III(A)2, below.

Plaintiff also attempts to distinguish this case from <u>Tingley</u> and <u>Green</u> by arguing that the plaintiffs in those cases did not allege a failure to disclose or that the prices of their houses were "artificially inflated" as a result of the defendant homebuilders' conduct.   (Stephens

1  Opp'n at 13.)   The existence of an additional allegation
2  of harm, however, does not salvage the FAC.
3
4     Moreover, Plaintiff fails to distinguish his case
5  from Kaing, in which the plaintiff claimed failure to
6  disclose and also alleged she was overcharged.  2010 WL
7  625365, at *2.  Plaintiff fails to persuade the Court
8  that these factors are sufficient to transform his
9  speculative harms into a cognizable injury in fact.
10
11     Plaintiff relies on Friends of the Earth, Inc. v.
12  Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167 (2000), to
13  argue he has pled a cognizable injury in fact.  (Stephens
14  Opp'n at 9-10.)  There, the Supreme Court considered the
15  ability to sue for environmental harm, and held that a
16  citizen adequately pled an injury in fact by alleging the
17  defendant's pollution interfered with recreational
18  opportunities.  528 U.S. at 183.  Plaintiff points to
19  language in the opinion referring  to an alleged
20  diminution in the value of the litigants' property.  Id.
21  at 182-83.  A diminution in value that is tied to a
22  physical change in the neighborhood's environment, such
23  as pollution in the case of Friends of the Earth, is
24  better characterized as concrete and particularized, and
25  actual or imminent, than a purely economic change in a
26  neighborhood.  Lujan, 504 U.S. at 560-61.
27
28

When faced with similar facts, the district court in
Kaing found the plaintiff had failed to plead actual
injury.  2010 WL 625365, at *5 ("Compared to the
diminution in value that is tied to a physical change to
the neighborhood's environment, such as pollution . . . a
decline in value that is tied to a purely economic change
to a neighborhood is much more difficult to characterize
as concrete and particularized, and actual or
imminent.").  The Kaing court noted a key difference
between environmental harm tied to physical damage and
economic harm: "[A diminution in value arising from
economic harm] can potentially evaporate before Plaintiff
has suffered a concrete injury, even in the absence of
redress from the courts."  Id.  While environmental
damage caused by pollution does not redress itself, the
complex economic factors that affected the value of
Plaintiff's residence can improve.  See Tingley, 2008 WL
1902108, at *4 n.3.

The capacity for Plaintiff's alleged injury to
fluctuate with changes in the economy, "strongly
suggests" that Plaintiff's alleged injury is "conjectural
and speculative, not actual or imminent."  Green, 2007 WL
2688612, at *3; see Sanner v. Bd. of Trade of City of
Chicago, 62 F.3d 918, 924 (7th Cir. 1995) (finding
soybean farmers who refrained from selling their crops
due to a depressed market price lacked standing to sue

under Article III, while those who sold at the depressed price enjoyed standing because "[t]he fact of a sale at an allegedly depressed price establishes discernable injury in a manner in which a failure to sell cannot."), citing <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 743 (1975).

Plaintiff next argues he has suffered an injury in fact because California law permits real estate buyers to sue for rescission and damages when a seller fails to disclose material facts.  (Stephens Opp'n at 10-11); <u>see</u> <u>Reed v. King</u>, 145 Cal. App. 2d 261 (1983).  This argument fails, however, because it merely states the remedies available to plaintiffs in failure to disclose cases, but does not establish an injury.

Furthermore, the facts in the cases Plaintiff cites are distinguishable from the context of this case; the failure to disclose in the former cases recognized a duty to disclose (1) physical defects and legal impediments to use of real property, (<u>Karoutas v. HomeFed Bank</u>, 232 Cal. App. 3d 767, 771 (1991) (finding a duty to disclose where plaintiff's residence had substantial and permanent soil movement that required costly repairs); <u>SanFran Co. v. Rees Blow Pipe Mfg. Co.</u>, 168 Cal. App. 2d 191, 205 (finding a duty to disclose where a property was missing walls and subject to various building code violations);

<u>Graf v. Sumpter</u>, 207 Cal. App. 2d 391, 392-93 (finding a duty to disclose where the land upon which plaintiffs' residence was built was not properly compacted, causing cracking and crumbling of the residence); or (2) in cases of extreme stigma, (<u>Reed v. King</u>, 145 Cal. App. 3d 261, 267 (1983) (finding a duty to disclose where residence was site of gruesome multiple murders committed on the property, but noting that such circumstances were "highly unusual")).

###    2.   Overpayment Theory

Finally, as to Plaintiff's overpayment theory, the Court construes these allegations as an attempt to describe Defendants' motives for issuing subprime loans. To the extent, however, that Plaintiff alleges he overpaid as a result of Defendants' efforts to inflate housing demand artificially by offering subprime loans, the Court finds the alleged injury is too speculative to constitute an injury in fact because it is not "concrete or verifiable." <u>See</u> <u>Kaing</u>, 2010 WL 625365, at *3, n.2. Plaintiff alleges that Defendants "market[ed] materials that depicted the community as a stable, family[-]based neighborhood" (FAC ¶¶ 35, 36) and "provided . . . false and misleading standardized representations and advertisements regarding the value of the house sold[,] [t]he sales practice of selling to investors[,] and the desirability of the neighborhood where the house was

sold" (FAC ¶ 73).   Plaintiff also alleges that Defendants
offered subprime loans to "artificially increase[]
demand" and thereby increase prices for houses in
Plaintiff's neighborhood.   (FAC ¶¶ 20, 30, 32, 35, 47,
65.)   As with Plaintiff's reduced-value theory, the
capacity for Plaintiff's alleged injury to fluctuate with
changes in the economy, "strongly suggests" that
Plaintiff's injury is "conjectural and speculative, not
actual or imminent."   <u>Green</u>, 2007 WL 2688612, at *3.

Thus, the Court finds that Plaintiff has failed to
articulate an injury in fact that is "concrete and
particularized, and actual or imminent."   <u>Cf.</u> <u>Lujan</u>, 504
U.S. at 560-61.

## B.   Causation

Plaintiff "faces a similarly insurmountable problem
with respect to the causation element of standing."
<u>Kaing</u>, 2010 WL 625365, at *6.   Plaintiff alleges he
overpaid for his house and suffered a reduction in the
value of his property caused by Defendants' wrongful acts
and omissions.   Plaintiff's injury must be "fairly
traceable to the challenged action of the defendant, and
not the result of the independent action of some third
party not before the court."   <u>Lujan</u>, 504 U.S. at 560.
"The line of causation between the [alleged] illegal

conduct and injury" must not be "too attenuated."   <u>Allen</u>

<u>v. Wright</u>, 468 U.S. 737, 752 (1984).

### 1.   Reduced-Value Theory

Plaintiff's reduced-value injury is not "fairly

traceable" to the challenged action of Defendants.

First, any loss in value Plaintiff has suffered has

resulted not just from the actions of Defendants, but

also from the independent actions of others, <u>e.g.</u>

homeowners in Plaintiff's neighborhood who defaulted on

their mortgages and third-party mortgage companies that

foreclosed on houses in Plaintiff's neighborhood.

Plaintiff's theory is premised upon a chain of causation

that is affected by general economic factors.  These

general factors can have unpredictable effects, such as

collapse of financial institutions, changes in the credit

market, and rising unemployment, which by themselves or

in combination affect the housing market.  In other

words, any injuries suffered by Plaintiff necessarily

depend upon a causal chain that includes numerous

independent forces and individual decisions of "some

third part[ies] not before the court."  <u>Lujan</u>, 504 U.S.

at 560-61.


Plaintiff alleges that Defendants (1) marketed the

house and neighborhood as stable and desirable (FAC ¶¶

19, 25, 28, 35, 84); (2) sold houses to "unqualified and

1   high-foreclosure-risk buyers" and assisted them in

2   purchasing or financing their houses (FAC ¶¶ 20-21); (3)

3   sold houses to "investors that were not owner[-]

4   occupiers of the houses," (FAC ¶ 25); and (4) did not

5   disclose this information to Plaintiff (FAC ¶ 28-39, 35-

6   36, 44).   Plaintiff concludes that as a result of

7   Defendants' conduct, the "neighborhoods [sic] where

8   Plaintiff lives have had a number of foreclosures," which

9   "have resulted in substantial loss of value to the

10  surrounding homes."  (FAC ¶ 47.)

11

12      As Defendants point out, an examination of the causal

13  chain reveals the speculative nature of Plaintiff's

14  injuries.  (See Lennar Mot. at 9.)  Plaintiff alleges

15  that Defendants sold houses in Plaintiff's neighborhood

16  to "unqualified" buyers.  Plaintiff defines as

17  "unqualified" those buyers who purchased their houses

18  with less than a 20% down payment.  Later, some of these

19  unqualified buyers defaulted on their mortgage loans.

20  Eventually, third-party mortgage companies foreclosed on

21  those houses; Defendants did not initiate these

22  foreclosure proceedings.  The loss of houses due to

23  foreclosure -- along with other factors -- eventually

24  contributed to a decrease in the value of Plaintiff's

25  house.  (See Stephens Opp'n at 9.)  When examining the

26  chain of events Plaintiff alleges, it is apparent that

27  the Plaintiff's alleged injuries necessarily depend upon

28

1  a causal chain that includes numerous independent forces
2  and individual decisions of "some third part[ies] not
3  before the court."  Lujan, 504 U.S. at 560-61.

4

5      Other courts have reached the same conclusion when
6  faced with nearly identical allegations.  See Kaing, 2010
7  WL 625365, at *6; Tingley, 2008 WL 1902108, at *4; Green,
8  2007 WL 2688612, at *3.  As the Kaing and Tingley courts
9  noted, a causal chain cannot be found or even inferred
10  from such allegations because each link in the chain may
11  be caused by factors other than Defendants' conduct.
12  Kaing, 2010 WL 625365, at *6; Tingley, 2008 WL 1902108,
13  at *4.  For example, the other owners may have defaulted
14  on their mortgages as a result of "other factors, such as
15  unemployment, health problems, a general weakening of the
16  economy, or other financial conditions."  Tingley, 2008
17  WL 1902108, at *4.  Furthermore, there are "intervening
18  decisions by the mortgage assignees to foreclose the
19  defaulted mortgages rather than to restructure the loans,
20  which may have been done for reasons totally apart from
21  the alleged fraud."  Id.

22

23      The allegations that the depreciation of Plaintiff's
24  property was caused by the foreclosures in his
25  neighborhood, "rather than as a result of a myriad of
26  other factors, such as rising unemployment in the region,
27  changes in the housing market, or other economic

28

conditions," falls short of the standard required to plead causation. <u>Kaing</u>, 2010 WL 625365, at *6. Although foreclosures can have an adverse impact on property values, supply and demand are affected simultaneously by a number of market factors. <u>See</u> <u>Tingley</u>, 2008 WL 1902108, at *4. Any combination of these factors may have caused a reduction in Plaintiff's property value. <u>See</u> <u>id.</u> Even assuming that the value of Plaintiff's property was affected adversely by foreclosures in his neighborhood, the connection "remains too tenuous to provide standing." <u>Id.</u>

The additional injuries Plaintiff alleges in the FAC -- "unstable neighborhoods, multiple families living in one home, transient neighbors with no long-term ties to the neighborhood, unfinished and unkempt yards, and in some cases, increased crime" -- are not "fairly traceable" to the challenged action of Defendants. Viewing the allegations in FAC in the light most favorable to Plaintiff, Plaintiff fails to plead facts sufficient "to raise a right to relief above the speculative level." <u>Bell Atlantic</u>, 550 U.S. at 555. The FAC contains nothing more than speculation to link these harms to Defendants' conduct or omissions. <u>See</u> <u>Kaing</u>, 2010 WL 625365, at *5-6 (holding that plaintiffs claiming similar injuries failed to allege causation sufficient to survive a motion to dismiss).

1   The fragility of the connection between Defendants'
2   alleged conduct and the decreased value of Plaintiff's
3   house is illuminated "with each additional link in the
4   chain where the choices of others have an impact and make
5   other scenarios at least as plausible as the one advanced
6   by . . . Plaintiff[]." _Id._  Put into concrete terms,
7   because Plaintiff still owns his property, a positive
8   change in the unemployment rate, housing market, mortgage
9   interest rates, or other economic factors could cause
10  Plaintiff's property value to increase, thus decreasing
11  or obviating his alleged losses.  Again, other courts
12  reached the same conclusion.  _Tingley_, 2008 WL 1902108,
13  at *4; _Green_, 2007 WL 2688612, at *3.

14

15       **2.  Overpayment Theory**
16       Turning to Plaintiff's overpayment theory, the Court
17  construes these allegations as an attempt to describe
18  Defendants' motives for issuing subprime loans.  To the
19  extent, however, that Plaintiff alleges he overpaid for
20  his house as a result of Defendants' efforts to inflate
21  housing demand artificially by offering subprime loans,
22  the causal connection between the alleged overpayment and
23  Defendants' "scheme" depends upon numerous independent
24  factors and third parties not before the court.  _See_
25  _Kaing_, 2010 WL 625365, at *6.

26

27

28

1     The third parties include, for example, the alleged
2  "unqualified" and "investment" buyers to whom Plaintiff
3  also indirectly assigns blame for the decrease in his
4  property value.  These third parties acted independently,
5  e.g., to default on loan payments, to choose their
6  tenants, or to maintain their properties, which in turn
7  directly affect losses Plaintiff allegedly suffered, thus
8  making it impossible to trace those losses to Defendants'
9  alleged misconduct.

10

11     Similarly, the "housing bubble," or inflation of
12  housing prices, was a nationwide phenomenon, traceable to
13  variables independent of Defendants' alleged scheme, such
14  as lax regulatory enforcement, rates of unemployment,
15  credit market developments, and general economic growth.
16  As with Plaintiff's reduced-value theory, it cannot be
17  said that the inflated purchase price Plaintiff allegedly
18  paid are fairly traceable to Defendants' alleged
19  "scheme."

20

21     Thus, taking Plaintiff's allegations as true, as the
22  Court must for these purposes, Plaintiff's harm is not
23  "fairly traceable" to Defendants' alleged conduct.
24  Plaintiff, therefore, does not have standing to sue for
25  paying an "inflated" purchase price for his house or for
26  a subsequent reduction in value of his house.  Hence, the
27
28

Court lacks subject matter jurisdiction over this action and accordingly DISMISSES the FAC,[3] with prejudice.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss.  As the Court finds that Plaintiff would be unable to amend his pleadings to correct the deficiencies related to constitutional standing, it dismisses the First Amended Complaint with prejudice.

The Court DENIES Defendants' Motion to Strike as moot.

**IT IS SO ORDERED.**

Dated: March 31, 2010

                                    Virginia A. Phillips
                                    _____
                                    VIRGINIA A. PHILLIPS
                                    United States District Judge

---

[3] As the Court finds Plaintiff lacks standing to assert his claims, it does not have jurisdiction over this matter.  The Court, accordingly, does not reach Plaintiff's and Defendants' arguments regarding Rule 9 and 12(b)(6) as to each claim.